THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
SALVADOR SANCHEZ, Defendant-Appellant.

First District (1st Division)    No. 79-2408

Opinion filed April 27, 1981.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Iris E. Sholder, and Deborah M. Dooling, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, Salvador Sanchez (defendant) was found guilty of the murder of Gustavo Carrillo and the aggravated battery of Emanuel Valdez and Tomas Catalan. He was sentenced to 20 years and 3 years, respectively, to be served concurrently. Defendant appeals.

Officer James Schmidt testified that on March 18, 1978, he received a call regarding a man shot at the Niagara Lounge. At that location he saw Gustavo Carrillo (decedent) lying on the sidewalk and Emanuel Valdez (Valdez) lying in the street. Tomas Catalan (Catalan), shot in the foot, was in the tavern.

Emanuel Valdez testified that on March 18, 1978, at about 4 a.m., he was walking out of the Niagara Lounge when he was shot twice by a man who was standing four steps away from the entrance. Valdez pointed to defendant as that man but said he was "not too sure" because he "felt so ill" at the time. Valdez said he did not know anyone at the tavern.

On cross-examination Valdez testified there had been an argument between defendant and another man. He never saw them push each other. Defendant and the other·man left together.

Bennie Fonte testified he was driving a truck and had stopped at a red light at a corner near the tavern. He heard a "pretty loud noise" and then saw a crowd to his left at the tavern. He saw a "flash of a gun going off." He saw a man "going from the sidewalk, and he [the man] dived between the parked cars to put the car between him and the man with the gun." He said he saw "a man standing there just firing into the crowd." The man fired the gun five or six times. The man stopped firing, held the gun at his side, walked a few steps, and ran. Fonte jumped out of the

truck and ran to the man behind the car. The man was bleeding. Another person was lying on the sidewalk nearby.

Tomas Catalan testified that on March 18, 1978, he and decedent each had three beers in a certain bar. They arrived at the Niagara Lounge at 3 a.m. Another man was with them. At one point decedent started talking to defendant who was close to the wall. Catalan did not hear what they said, but heard them laughing. Catalan went to the bathroom and when he returned, decedent and defendant "were going out." Catalan "stood to go follow them" because he thought he and decedent were going home. He was 15 or 20 feet away. Decedent walked ahead of defendant. They were standing outside the door. Catalan testified, "When I stepped up alongside of him, I told them, '[I]t appears like you maybe wanting to fight, that is not right. You are working partners.' " Defendant walked 25 feet away. Then he "stopped suddenly, and turned around and started to fire." Before defendant fired, he and decedent were talking, but Catalan did not hear what was said. After defendant started to fire, Catalan "got scared" and "felt where he shot me in the leg." He went back inside the tavern.

Catalan also testified he, defendant, and the decedent worked in the same factory. He and decedent had two more beers to drink at the tavern. He did not see any struggling or pushing between defendant and the decedent. He denied telling an officer he said so after the incident.

The parties stipulated that if Dr. Tae Lyong An were called he would testify he examined the body of decedent on March 18, 1978. Decedent was 5 feet 9 inches tall and weighed 222 pounds. The body contained five entry wounds and four exit wounds.

Officer Dennis Wheeler testified he was employed as a Los Angeles police officer. On April 1, 1978, he, Officer Gory, and Officer Sheehan went to a certain residence in Los Angeles. Wheeler told the man who opened the door he had a fugitive warrant for defendant for murder. The man said defendant was inside. Wheeler saw defendant inside. Defendant "made an attempt to run out the back door," was confronted by an officer and went back in. The officers took defendant to the police station in a car. He was read his rights and indicated he understood them. Wheeler said defendant stated, " 'That guy kept pushing me and pushing me.' "

Officer Gory asked defendant what kind of gun he had used. Defendant said it was a Browning 9-millimeter automatic. Defendant stated he had thrown the gun away between Chicago and Los Angeles. He said he had only so much patience and decedent had pushed him and he was not sorry for what he had done. These conversations were all in English.

Sergeant Joseph Celorsky, a firearms examiner, testified the bullets collected from the scene were fired from a 9-millimeter weapon.

Investigator William Baldree testified that on March 18, 1978, he went to St. Anthony's Hospital where he saw Valdez in the emergency room. Officer Hosea Torres was also there. At the time of trial, Torres was in a hospital due to a recent automobile accident. Torres served as an interpreter. Torres told Baldree about the conversation he and Valdez had. Torres said Valdez had said there had been a shoving incident and an argument. It was closing time. After they were going out the door, one of the men who had been in the argument pulled a pistol and started shooting. Valdez was shot, and he saw decedent shot. Defendant then fled. Torres said Valdez said the others in the tavern were his friends. Torres also said Valdez, Catalan, and decedent left the tavern at the same time.

The parties stipulated that if Officer Torres were called to testify he would state he interviewed Catalan in the emergency room on March 18. Catalan said he saw decedent arguing with defendant. Catalan told decedent they should leave. They got up and walked out.

Defendant testified he went to the tavern at 3 a.m. on March 18. He had three drinks. He saw decedent when he was at the bar and decedent walked by on his way to the bathroom. Defendant greeted him and decedent "kept looking" at him. Defendant testified, "He said that I thought I was hot stuff, but I was worth shit." Defendant asked him why he told him that. Decedent grabbed his collar. Defendant "tried to pull away from him, but he said * * * he could do anything he wanted with me." Then four other men came closer. Two of them, Valdez and Catalan, testified. Decedent said he had friends who could do anything he wanted. The other men stared and laughed and decedent said " 'come on, you son of a bitch.' " He did not know at that time if the other men had weapons.

Defendant said, "I felt fear and decided the best thing to do was to leave and go home." He had stepped outside when he saw they were all following him. Decedent told him, " '[T]his is it, you are going to get it, you SOB.' " At that point decedent was "closer to me with his friends behind him." Defendant testified, "I took out the gun." He said he fired and "was afraid." He did not know whether decedent had a weapon. After he fired the first time, decedent continued to get closer to him. He "fired more" and then "looked and I didn't know what to do so I ran."

He went to Los Angeles where he was arrested in his friend's house. Investigator Wheeler had his gun drawn, so defendant "got scared" and "jumped from the table in the kitchen." Defendant testified he spoke to the Los Angeles police. He said that on March 18 he was carrying a semi-automatic 9-millimeter pistol with 12 bullets.

On cross-examination defendant said he did not know how many times he fired. Decedent kept coming so he kept shooting. He said

decedent was the only one he fired at "because he was walking in front of them." He also said in the tavern he "was telling him I didn't want to have anything to do with him." He said he threw the gun away about two blocks from the scene.

On redirect he said he was carrying a gun because he "had been beaten and robbed twice." He said when he spoke to the police he told Investigator Wheeler he was not sorry "because he threatened me many times, insulted me, and I kept telling him I didn't want anything to do with him." He continued, "I took a lot from him, and I thought he could kill me. I didn't know what else to do." He said he told Wheeler he had nothing against decedent and had no reason to fight.

■■ Defendant contends the State failed to prove defendant guilty beyond a reasonable doubt because it failed to prove defendant did not act in self-defense. Self-defense is an affirmative defense. (Ill. Rev. Stat. 1979, ch. 38, par. 7—14.) Once defendant has presented "some evidence" of self-defense (Ill. Rev. Stat. 1979, ch. 38, par. 3—2(a)), the State bears the burden of proving defendant guilty beyond a reasonable doubt as to that issue and all other elements of the offense. *People v. Woods* (1980), 81 Ill. 2d 537, 542, 410 N.E.2d 866.

■■ A person is "justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another * * *." (Ill. Rev. Stat. 1979, ch. 38, par. 7—1.) This depends on surrounding facts and circumstances and is to be determined by the trier of fact. *Woods*, 81 Ill. 2d 537, 542.

In the instant case the jury was presented with conflicting versions of the incident. Emanuel Valdez testified defendant and another man argued at the tavern but there was no pushing. Tomas Catalan testified he told decedent and defendant " 'it appears like you maybe wanting to fight * * *' " but he saw no physical altercation. Defendant testified decedent grabbed his collar and told him he could do anything he wanted to defendant. Four other men surrounded defendant, and when defendant left the tavern, they followed him saying, " 'You are going to get it * * *.' " Defendant was in such fear that he shot decedent several times in self-defense.

"It is within the province of the jury to judge the credibility of witnesses, weigh the testimony and determine matters of fact." (*People v. Benedik* (1974), 56 Ill. 2d 306, 310, 307 N.E.2d 382.) If defendant's testimony is disbelieved, no legal justification for the shooting can reasonably be inferred. The jury apparently chose the version of the incident advanced by Valdez and Catalan.

This court will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of defendant's guilt. (*People*

*v. Owens* (1976), 65 Ill. 2d 83, 90, 357 N.E.2d 465, *cert. denied* (1977), 430 U.S. 955, 51 L. Ed. 2d 805, 97 S. Ct. 1600.) After carefully reviewing this record, we find the verdict amply supported by the evidence. We note also defendant's flight to Los Angeles after the shooting as evidence of consciousness of guilt. *People v. Aguero* (1980), 87 Ill. App. 3d 358, 363, 408 N.E.2d 1092.

In our opinion, *In re S. M.* (1981), 93 Ill. App. 3d 105, 416 N.E.2d 1212, cited by defendant, is inapposite. This court commented about the fact that the respondent there "tried to avoid a confrontation." He retreated from the group and they pursued. Also, he "made repeated efforts to flee." Again he called for "on-lookers to get help." In addition, he fired a warning shot into the air. (93 Ill. App. 3d 105, 110.) These factors are not present in the case at bar. In the cited case, respondent was found guilty of voluntary manslaughter. Defendant in the case before us was found guilty of murder. In the instant case the deceased was shot five times. One entry wound was at the back of the victim. In his reply brief, defendant attempts to refute this fact with the argument that the preceding bullet might have spun the deceased about so that the next shot entered his back. However, we cannot agree that the cited case is applicable here.

■■■ Defendant also contends this court should reduce the degree of the offense to voluntary manslaughter (73 Ill. 2d R. 615(b)(3)). The record reflects the court tendered Illinois Pattern Jury Instructions, Criminal, Nos. 7.03, 7.04, 7.05 and 7.06 (1968), to the jury. The jury was fully and properly instructed on the offense of voluntary manslaughter. It was within the province of the jury to find defendant guilty of voluntary manslaughter only, rather than murder. (Ill. Rev. Stat. 1979, ch. 38, par. 9—2.) The jury rejected this alternative and thus found defendant did not have a subjective belief that the use of force was necessary. (See *People v. Lockett* (1980), 82 Ill. 2d 546, 551-52, 413 N.E.2d 378.) "Whether defendant acted in self-defense or if not, whether the facts of the assault constitute murder or manslaughter is a question to be determined by the trier of fact and that determination will not be disturbed on review unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt as to defendant's guilt." (*People v. Pearson* (1976), 40 Ill. App. 3d 315, 317-18, 352 N.E.2d 240.) We find no reasonable doubt as to defendant's guilt.

Defendant next quotes five separate statements made by the prosecutor in final argument and contends they constitute reversible error. We need not extend this opinion by setting out the details of these various comments. It is sufficient to say that we have read the closing arguments by the prosecution, and we have given careful consideration to each and every contention made by defendant.

■■ Defendant made no objection to any of these comments at trial. When a defendant fails to make such a timely objection, irregularities in the closing argument are ordinarily deemed waived. (*People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739; *People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233.) Therefore, we may consider these matters only if they constitute plain error affecting substantial rights of the accused (73 Ill. 2d R. 615(a)) in a situation where the evidence is closely balanced. *Jackson*, 84 Ill. 2d 350, 359.

■■ In this case we do not find the evidence closely balanced. We conclude that defendant may not rely upon the plain error doctrine. The fact that defendant raised certain of these objections in his motion for new trial does not change the result. See *Carlson*, 79 Ill. 2d 564, 576-77.

■■ In addition, even if timely and proper objections had been made, we find no reversible error here. Some of these comments were properly made in answer to arguments previously made by the defendant. (*People v. Vriner* (1978), 74 Ill. 2d 329, 344, 385 N.E.2d 671, *cert. denied* (1979), 442 U.S. 929, 61 L. Ed. 2d 296, 99 S. Ct. 2858.) Other arguments were proper as pointing out the evils of crime. (*People v. Hairston* (1970), 46 Ill. 2d 348, 375, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 136, 91 S. Ct. 1658.) At least one other argument was proper comment on the evidence and drew reasonable inferences therefrom. *People v. Wright* (1974), 56 Ill. 2d 523, 531, 309 N.E.2d 537.

Furthermore, viewing the entire record here we cannot say that each of the assailed prosecutorial comments or all of them constituted " 'a material factor in the conviction' " (*People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363; *People v. Swets* (1962), 24 Ill. 2d 418, 423, 182 N.E.2d 150), or resulted in "substantial prejudice to the accused" (*People v. Nilsson* (1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881, or the verdict would have been different had the comments not been made (*People v. Singletary* (1979), 73 Ill. App. 3d 239, 254, 391 N.E.2d 440). Finally, the trial judge instructed the jury that opening statements and closing arguments are not evidence. See *People v. King* (1977), 66 Ill. 2d 551, 559, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273; *People v. Smith* (1977), 53 Ill. App. 3d 395, 404, 368 N.E.2d 561, *appeal denied* (1978), 67 Ill. 2d 594.

For these reasons the judgment appealed from is affirmed.

Judgment affirmed.

O'CONNOR and CAMPBELL, JJ., concur.