THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
LEON POLIQUIN (Impleaded), Defendant-Appellant.

First District (1st Division)    No. 78-1418

Opinion filed June 1, 1981.

Loretta Hall Hardiman, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Mary Ellen Dienes, and Gael McCaughey-O'Brien, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, Leon Poliquin (defendant) was found guilty of conspiracy to commit armed robbery and the felony murder of John Stojanov. Defendant was sentenced to 15 to 30 years. He appeals. Frank Rayna, a codefendant, was tried separately and found guilty of attempt armed robbery and murder.

Officer Frank Topfenbaum testified that on March 29, 1974, at 7:32 a.m., he received a call regarding a man shot at the Penguin Laundromat. At the laundromat, he saw defendant and defendant's wife, Patricia Poliquin, behind a counter. Defendant pointed toward the back and said,

" 'He's there, he's back there.' " The officer testified the office door "appeared to be kicked in" and he saw the decedent on the floor. He stated the "office appeared to be ransacked" and "[t]here were various letters and money bags laying on the floor, and a cash box * * *."

Officer Topfenbaum also testified defendant told him he had received a phone call from Patricia that decedent was shot. Defendant said he went to the laundromat and kicked the door down to see if decedent was all right. Patricia told him the assailant was a tall white male who announced a robbery. Decedent told her to call the police. The decedent and assailant had an altercation in the back. Patricia hid in the bathroom during the shooting. Topfenbaum found four bullet holes in the door and saw a loaded gun on the floor under the table.

Officer Nicholas Schuler testified he saw the office ransacked and the decedent and the gun on the floor. The decedent had approximately $696 in his wallet.

Officer Schuler testified he interviewed Patricia at 8:30 or 8:35 a.m. Defendant was also present. Patricia told Schuler she had arrived there at 7 a.m. At 7:30 she heard decedent arguing with someone and someone called to her, "Come over here I will blow your brains out." She saw a white man, about 6 feet tall and 200 pounds, with a gun. The man ordered them toward the back of the store. Decedent opened the office door and turned on the light as instructed by the man. The man stood in the doorway of the office. Then decedent turned around, turned off the lights, and tried to close the door. Patricia heard a shot, hid in the bathroom, heard more shots, and then heard nothing. She called defendant and said decedent was shot. Defendant told her to call the police and he would come over.

Officer Schuler also testified defendant told him he received a call from Patricia at 7:25 a.m. She said decedent had been shot. Defendant went there and told Patricia to call the police. He went to the back and found the office door locked. He kicked in the door. At that time police arrived.

Investigator Edward Adorjan testified that on March 29 he went to the Poliquin residence and had a conversation with them. Then Patricia voluntarily went for a polygraph test at 11th and State. Defendant and Adorjan waited in the lobby. Defendant told the officer, "I know that she is going to fail * * * I know that she is going to fail because we know what happened." Defendant said he would rather tell what happened to Sergeant John DiMaggio.

Sergeant DiMaggio testified that on March 29 he went to the Poliquin home. Defendant and Patricia left with Officer Adorjan so Patricia could take the polygraph tests. DiMaggio did not leave with them. Later he had a conversation with defendant and Patricia. Defendant asked if DiMaggio

believed defendant was the murderer. DiMaggio told him he "did believe that he committed the murder." He read defendant the *Miranda* warnings.

DiMaggio testified defendant "stated immediately that his nephew Frank Rayna was the one that perpetrated the crime and killed the man in the laundromat." Defendant said that on March 28 Rayna visited him and showed him a .357 Magnum pistol. Defendant told him Rayna said, "I'm busted, and I need a score. I have to make money." Rayna stated defendant responded, "I know a place in the area that you could hit, but specifically a laundromat where my wife works and it's an easy score. An old man who'll give you the money right away." Defendant continued that he and Rayna went out together and defendant pointed out the laundromat to Rayna. It was less than a block from defendant's house.

Rayna slept at the Poliquin residence. Defendant awakened him around 6 a.m. Rayna left, but returned because the door was locked at the laundromat. Rayna and Patricia left a little after that.

The defendant also said that shortly thereafter Rayna returned and left the gun at defendant's house. Rayna told defendant he was in trouble because he "shot the man and the man was reaching for a gun or something * * *." Defendant hid the gun in the bedroom closet. Defendant then went to the laundromat because Patricia had called. Defendant wanted to help decedent and in so doing broke down the door. Defendant also told Patricia to call the police. Rayna also told defendant there was no mention of money preceding the robbery. Defendant was charged seven to ten days after these events. Defendant asked DiMaggio "not to fault his wife for telling lies to the police because he told her to lie to police to protect the nephew * * *."

DiMaggio testified Patricia also gave him a statement. He said, "Her statement * * * was in complete agreement with [defendant's] statement * * *." She said she had told the officers the truth about the murder when she was previously questioned but she omitted to tell them the perpetrator was her nephew and she had given a fictitious description to protect her nephew.

DiMaggio also testified defendant told him the weapon was in his house. DiMaggio went with defendant and another officer to defendant's house. Defendant gave the police a .357 Magnum pistol and six shell casings. DiMaggio testified defendant allowed two officers to spend the night at his house for the purpose of arresting Rayna if Rayna should return.

Phillip DiMarzio, assistant State's Attorney, saw defendant and Patricia at 8 p.m. on March 29, 1974. He advised them of their *Miranda* rights and asked them if they understood these rights. He stated, "Both Mr. Poliquin and his wife indicated that they did wish to answer questions

and give up their rights under the *Miranda* ruling." Defendant told the attorney the same story he had told DiMaggio. Defendant also stated he told Rayna there was a lot of money in the back of the laundromat. Defendant also said he examined Rayna's gun and twirled it on his finger. He said when Rayna returned from this first trip to the laundromat, the laundromat had been closed. Defendant told DiMarzio he told Rayna to wait until it opened.

DiMarzio said defendant's written statement was typed, and defendant signed the statement. He also said he told defendant when he was signing the statement if he wanted to read the statement again to take as much time as he needed. He also "asked him to make any corrections in the statement that he thought should be made, as far as accuracy." Defendant "made one correction in it * * * a letter or word that had been left out." At one point defendant said to DiMarzio, "There's no way that I can be charged in this case, is there?" DiMarzio told him he "could make no promises at all in that regard."

Officer Ernest Warner, a firearms examiner, tested the gun found in defendant's house. In his opinion, the expended cartridges recovered from the scene and the body of deceased were fired from that gun.

Frank Rayna, 18 years old at the time of the occurrence, testified that on March 28, 1974, he called defendant and told him he bought a gun. Defendant asked if Rayna wanted to bring it over because he would like to see it. At defendant's home, he and Rayna went into the bedroom where Rayna showed defendant the gun. Rayna testified defendant "played with" the gun. Defendant asked him "how I was for money." Rayna said he "didn't have too much." Defendant "said he knew how I could make some money." Rayna testified, "He told me that we could do a stickup at the laundromat, but that he couldn't go in because he knew the owner there."

Defendant and Rayna walked to the store. Defendant pointed out the laundromat and said "there was a guy there who had a lot of money" and who "had been robbed several times before." He continued, "More or less, he was an easy hit."

When they returned, "Leon [defendant] started going into details on how to do the robbery." Defendant said Rayna was to "go in and announce it's a robbery, hold the gun out of eyeshot from the street * * *, take him to the back * * *, get the money and leave." Rayna stated Patricia told him that the "money was kept in this box, and to be careful * * *, the owner had a gun." Patricia "penciled out on a piece of paper, more or less, the layout on where the money was kept on this desk."

Rayna also testified he took LSD on March 28. He spent the night at the Poliquin home. Defendant awakened him at 6 a.m. At the laundromat,

Rayna saw the owner and found the door locked. He returned to the Poliquin residence. Defendant said to wait until Patricia went to work.

Rayna testified Patricia left around 7 a.m., and Rayna left for the laundromat 5 to 10 minutes later. He saw a policeman at the laundromat and waited. When the officer left, Rayna went in, "pulled the gun out of [his] pocket," and announced "a stick up." Decedent told him to get out because he was going to call the police. Decedent told Patricia to call the police. Rayna told her to "freeze." Rayna stated he told decedent to "open up the office, and he said he couldn't find the keys." Decedent "started looking around for these keys and Patty saw them over on the counter, picked them up, and handed them to him." At the back near the office Rayna told Patricia to turn on the lights "and at the same time the owner of the store was opening the door of the office." Patricia was "still messing with those light switches * * * and made one step towards us and he produced a pistol." Decedent pointed the gun at Rayna. Rayna testified he "yelled something at him, and then firing started, and I slammed the door and fired some more, and ran." Rayna didn't know if decedent fired a shot.

Rayna took a route back to defendant's house that defendant had selected the night before. Rayna told defendant he had no money and decedent had "pulled a gun" on him. Defendant said to "just get upstairs and get in the house." Defendant left for the laundromat and returned 45 minutes later. Rayna had put the gun in a drawer, but defendant put the gun in a closet. He then left to go to the police station with Patricia. Defendant told Rayna "to keep my mouth shut and don't call and tell anybody about this * * *." Rayna saw defendant and Patricia again at 12 o'clock that day. Defendant gave him money for a cab, and he left.

On March 30 at 12 a.m., Rayna went back to the Poliquin residence and was arrested. He made a written statement and was charged with attempt armed robbery and murder. He was convicted.

On cross-examination he testified he had just lost his job. He did not tell defendant he needed to score. Rayna stated he made a deal with the State. At his own trial he stood mute on stipulated facts in return for a sentence of 14 years rather than 20. The agreement also included testimony against defendant.

Defendant testified that on March 28, 1974, Rayna called him, said he bought a gun, and wanted to talk to defendant. Later Rayna went to the Poliquin residence and carried the gun in a shoulder holster. He said he borrowed $75 to buy it and he needed it to make some money because he was broke. Defendant told him he could not give him the money he needed. Rayna told defendant there was a tavern or liquor store he wanted to rob. Defendant refused to rob it with him. Rayna said it would

be "nothing" and defendant replied the owners or bartenders are armed and there would be police inside. Defendant testified he made it clear to Rayna he "wasn't going to commit any robberies with him." Defendant said, "If you're going to rob something, pick something easy * * * such as a grocery store or laundrymat [sic] * * *."

Defendant testified he took the dog for a walk and Rayna went with him. When they approached the laundromat, Rayna asked him, "[I]s that * * * the type you were talking about?" Defendant answered, "Yes." Rayna said he would rather hit a tavern. Defendant told him, "whatever you do, I don't want nothing to do with it. I don't want to know anything about it, you know, just nothing." He also said he did not want Rayna "doing anything" in the area because he lived there.

Defendant testified Rayna wanted to spend the night and asked defendant to call him at 6 a.m. He did not say why he wanted to be awakened at 6 a.m. and defendant "did not ask." At 6 o'clock Rayna told defendant he was going to rob a laundromat. Defendant testified, "I told him if you are going to do it, do it now or do it early." Patricia, he stated, was going to work there a little later and he "didn't want her involved." Rayna left and returned. He said the laundromat door was locked and "he wasn't going to do it, again * * *."

At about 7:30 a.m., Patricia called him and said decedent had been shot. Defendant told her to call the police and he would come over. At this point defendant did not know Rayna had shot decedent. At the laundromat Patricia told defendant decedent was in the back. Defendant "ran in the back and I bounced off a wall, because I didn't know how the back was laid out." Defendant heard decedent groaning and tried to open the door. The door was locked. He testified, "I heard like it fall and I just instinctively kicked in the door." Then he heard the police and told two officers where decedent was. Defendant went to the police station and then back to his home.

At his house Rayna told him he had taken Patricia and decedent to the back room. Decedent opened the door, pulled a gun, and fired at him. Rayna said he had no choice but to shoot. Defendant testified he told Rayna to "get out now." Rayna said he had no car or money, so defendant gave him $10. Defendant "took the gun" from Rayna because defendant "was afraid if he was stopped on the street by the police there might be a shootout and he might get shot." Defendant's cartridges were in the gun. Defendant had noticed the "dum dum bullets" in the gun, and he gave Rayna six shells. Defendant put the gun in the closet. Rayna left in a cab.

The police arrived at defendant's house 15 minutes later. Officer DiMaggio wanted to see Patricia. Defendant went to the station and had a conversation with DiMaggio and gave a written statement. At some point Patricia told defendant Rayna had shot decedent. He went home with

Patricia. Two officers went with him in case Rayna returned. Defendant agreed to let the officers go home with him.

The next day Rayna called defendant, and one officer listened on the extension. Rayna asked if he had disposed of the gun and defendant told him no. Rayna said he would pick it up, and 30 minutes later he arrived. The officers arrested him.

Defendant testified DiMaggio told him Rayna had requested a lawyer and "he told me to get him to make a statement, tell him anything you want, you just get him to make a statement." Rayna asked him why defendant tricked him. Defendant said, "Patty failed a lie detector test and they knew she knew who had shot [decedent]." Defendant continued, "[T]hey were going to charge us with that crime if we didn't tell them who did it * * *." Defendant said, "[T]hey want you to make a statement and if you agree to make a statement they will charge you with only voluntary manslaughter." He added, "if you give a statement it shows you are cooperating, they won't charge you. It will be better for you." Defendant testified, "Other than what Sergeant DiMaggio told me to tell him anything I wanted to, it just come out of my head."

In defendant's earlier conversation with DiMaggio, defendant stated he told him these facts. He said he did not have a conversation with assistant State's Attorney DiMarzio before giving his written statement. At one point he saw DiMarzio talking to DiMaggio. DiMarzio told defendant he would like to get a written statement from him. Defendant testified, "I asked him if I was going to be charged in this matter and he told me, 'no, you are cooperating, you will not be charged.'" Defendant said he signed the written statement but did not have occasion to read it. He said he "glanced at it as I initialed it and signed it * * *."

Defendant testified that in 1965 he was convicted of armed robbery and served 45 months on a 2- to 8-year sentence. On cross-examination, he testified he was convicted of two armed robberies.

Considering all of the facts before us, quite aside from the testimony of the accomplice, we find the defendant examined the new gun shown him by Rayna. Defendant substituted his own shells for the cartridges originally in the gun. Defendant advised Rayna not to hold up a saloon. He suggested and recommended the laundromat to Rayna. He took Rayna for a walk and pointed out the laundromat. After the shooting defendant took and hid Rayna's gun. Defendant informed the police he had told his wife to lie. Defendant then told the police Rayna had committed the crime.

Defendant corroborated the fact that he had pointed out the laundromat to Rayna. Defendant's testimony concerning the alleged fact that he did not need money was discredited. Defendant also testified he had no conversation with assistant State's Attorney DiMarzio before giving his

written statement and he signed this statement without reading it. In short, defendant's own testimony was completely rebutted by DiMarzio and also by the testimony of Officer DiMaggio. Their testimony served as strong corroboration for the testimony of the accomplice. In our opinion, an impartial reading of the record convinces beyond reasonable doubt that the evidence of guilt of the defendant is cogent and strong to the point of being overwhelming.

We will next consider the legal issues raised by defendant's able counsel.

I

Defendant contends the trial court should have excluded certain statements he made in reliance on promises of immunity or leniency. Prior to trial, defendant moved to suppress these oral statements and his written statement. After a hearing, the trial court denied the motion.

At the hearing, defendant testified Sergeant DiMaggio told him, "[I]f you tell us who it was and cooperate with us, you will not be charged. I will do everything I can for you." Defendant stated he asked assistant State's Attorney DiMarzio, "I am not going to be charged if I give this statement?" DiMarzio stated, "right." However, defendant also testified DiMarzio said at one point he would not be charged with anything "unless it turns up that you were directly involved with the crime."

The State denied promising defendant leniency or immunity. DiMaggio testified he advised defendant of his rights. He did not at any time make any promises as to whether defendant would be charged or not. At trial DiMaggio testified that on the day of the murder he told defendant he thought defendant murdered decedent. DiMarzio stated he advised defendant of his rights and asked him if he wished to waive them. Defendant responded affirmatively. At one point defendant mentioned the charges that might be brought against him. DiMarzio told him he "could make no promises whatever."

There is a conflict of testimony here. "It is for the trial court to resolve conflicts in the evidence presented." (*People v. Medina* (1978), 71 Ill. 2d 254, 258, 375 N.E.2d 78.) The trial court, having observed the demeanor of the witnesses and having heard the testimony, "is the one best equipped to determine the voluntariness of a confession." *Medina*, 71 Ill. 2d 254, 258.

■■ In the instant case, the trial court concluded the State made no promises of immunity or leniency. "The findings of the trial court on the voluntariness of a confession will not be disturbed unless it can be said that it is contrary to the manifest weight of the evidence." (*People v. Brownell* (1980), 79 Ill. 2d 508, 521, 404 N.E.2d 181, *cert. dismissed* (1980), ___ U.S. ___, 66 L. Ed. 2d 14, 101 S. Ct. 59.) We find defendant's

confession and statements were voluntary. The trial court's determination is amply supported by the record.

## II

■■ Defendant's next contention involves the legal propriety of a peremptory challenge exercised by the State. The record makes it impossible for us to consider that point. The record shows the jury was selected on March 13, 14, and 15, 1978. The proceedings which took place in connection with selection of the jury have not been preserved. There is simply a note by the court reporter regarding the selection of the jury: "The court reporter's presence being waived."

The motion for new trial, which raised among other points the propriety of a peremptory challenge by the State, was argued before the trial court on May 2, 1978. The record of the proceedings for that day contains the arguments of counsel and a ruling by the trial court denying the motion for new trial.

However, we cannot accept statements of counsel in lieu of a duly prepared and authenticated report of proceedings. Supreme Court Rules 323(c) and (d) set out the necessary procedure for a bystander's report of proceedings or an agreed statement of facts. These rules are specifically applicable to criminal appeals. See Ill. Rev. Stat. 1979, ch. 110A, pars. 323(c), 323(d), and 612(c).

We find authority in the decisions of this court which demonstrates the legal impropriety of review of any contention which depends upon a record not before us. See *People v. Bracey* (1981), 93 Ill. App. 3d 864, 870, 417 N.E.2d 1029; *People v. Fleming* (1980), 91 Ill. App. 3d 99, 107, 413 N.E.2d 1330.

For the sake of completeness we will add it appears from the statement of counsel defendant's claim is apparently based upon the contention a juror was improperly excused by the trial court. It is difficult to conceive how any claim of prejudice can be based upon the juror's mental state, a totally mysterious and unknown matter. We find other situations in which reviewing courts require a showing of specific prejudice in these analogous situations. (See *People v. Harris* (1979), 74 Ill. 2d 472, 475, 386 N.E.2d 60 (involving an alleged incident with a juror in a corridor); *Pekelder v. Edgewater Automotive Co., Inc.* (1977), 68 Ill. 2d 136, 139, 368 N.E.2d 900 (involving false testimony by jurors on *voir dire*); *People v. Peters* (1975), 33 Ill. App. 3d 284, 288-89, 291, 337 N.E.2d 716, *appeal denied* (1976), 61 Ill. 2d 603 (involving alleged telephone calls to a juror from an anonymous caller and also allegedly prejudicial pretrial publicity).) All of these authorities require a specific showing of prejudice against the moving party. In addition, it has been "consistently held that a

claim of prejudice cannot be founded on mere conjecture." *People v. Lewis* (1975), 60 Ill. 2d 152, 158, 330 N.E.2d 857.

## III

At trial Investigator Adorjan testified he took Patricia to 1121 South State Street where she was given a polygraph examination. Defendant and the officer waited outside the room. Defendant told Adorjan, "I know she is going to fail * * * because we know what happened." Defendant said he wanted to tell Sergeant DiMaggio what had happened. Sergeant DiMaggio testified Patricia was taken to the station for the polygraph examination.

Defendant contends the testimony Patricia had taken polygraph examinations should not have been admitted. Defendant urges this error was made more serious because it emphasized Patricia's role as a co-conspirator and implied defendant took a polygraph examination.

The results of a polygraph examination "are not admissible at trial to prove the guilt or innocence of the accused." (*People v. Vriner* (1978), 74 Ill. 2d 329, 347, 385 N.E.2d 671; see also *People v. Sanders* (1974), 56 Ill. 2d 241, 253, 306 N.E.2d 865, *cert. denied* (1974), 417 U.S. 972, 41 L. Ed. 2d 1143, 94 S. Ct. 3178.) Similarly the fact of giving a polygraph examination has been held inadmissible to prove the guilt or innocence of the defendant. (*People v. Parisie* (1972), 5 Ill. App. 3d 1009, 1036, 287 N.E.2d 310, *appeal denied* (1972), 52 Ill. 2d 596; *People v. Nicholls* (1970), 44 Ill. 2d 533, 539, 256 N.E.2d 818.) However, in the instant case, testimony regarding the taking of the examination was with reference to a person who did not testify at trial and who was not the defendant. See *Parisie*, 5 Ill. App. 3d 1009, 1036; see also *People v. Rutledge* (1977), 45 Ill. App. 3d 779, 782, 359 N.E.2d 1233.

In *Rutledge*, there was evidence by the State that a witness, Bill Aten, had been offered a polygraph test. However, Aten was "an accomplice who had earlier pleaded guilty to the theft" and who had testified. (45 Ill. App. 3d 779, 781.) In the instant case, Patricia did not plead and did not testify. Further, in *Rutledge* the State's Attorney asked Aten a direct question: " 'I offered you a polygraph examination, did I not?' " 45 Ill. App. 3d 779, 782.

■■ Manifestly, testimony Patricia had taken the examination did not mean defendant had either taken or failed the test. (See *People v. Melquist* (1962), 26 Ill. 2d 22, 29, 185 N.E.2d 825, *cert. denied* (1963), 372 U.S. 967, 10 L. Ed. 2d 130, 83 S. Ct. 1093.) In *Parisie*, the State's Attorney asked a State's witness if he had taken a polygraph test. The witness answered affirmatively. This court held the error was harmless because the question "was purely with reference to the *witness* and *not* the *defendant*" (5 Ill. App. 3d 1009, 1036) precisely as in the instant case. In

*Melquist*, a newspaper reporter called as a witness merely testified the defendant was asked, "If you were guilty, why did you take a lie test?" An objection by defendant was sustained. The supreme court held there "was not a sufficient ground for declaring a mistrial, even though it conveyed to the jury the impression that the defendant had taken a lie-detector test." (26 Ill. 2d 22, 30.) Similarly, in the instant case, the fact that Patricia had voluntarily taken the polygraph examination had no relation to or bearing upon the guilt or innocence of defendant.

Furthermore, defendant himself said to Adorjan, "I know she is going to fail * * * because we know what happened." This statement referred, of course, to Patricia, who was taking the polygraph examination at that moment. Defendant meant necessarily that he and his wife had not been truthful, and his statement constituted a material admission which led to defendant's confession and the ultimate arrest of defendant and Rayna.

Defendant relies on *People v. York* (1975), 29 Ill. App. 3d 113, 119-20, 329 N.E.2d 845, where evidence was admitted that the victims of aggravated incest had taken polygraph examinations. The court held the admission was error because the obvious implication was the defendant would not have been prosecuted had the results been negative. That case has no bearing on the facts before us. As shown, Patricia was not a complaining witness and did not testify.

We also conclude that even if the evidence in question constituted error, the strength of the evidence adduced by the State rendered such error harmless.

## IV

On direct examination by the State, Rayna testified he was charged with attempt armed robbery and murder, was convicted, and had not as yet been sentenced. With regard to promises made as to the recommended sentence, he testified he was told the State "was going to recommend either a flat 20, or 14 years and a day, under the old sentencing laws." Defendant contends testimony that Rayna was convicted was admitted as evidence of defendant's guilt and should have been excluded.

We note initially defendant failed to object to the admission of this evidence and was aware prior to trial that the State would elicit the testimony in its case-in-chief. In fact, the State moved *in limine* to bar defense counsel from cross-examination of Rayna as to other crimes. Defense counsel pointed out Rayna had been found guilty of murder. The State advised the trial court that fact would be brought out on direct examination. Defense counsel did not object. We find defendant's failure to object waives the issue on appeal. *People v. Carlson* (1980), 79 Ill. 2d 564, 576, 404 N.E.2d 233.

■■ Considering the matter further for completeness, we also find the admission of this evidence did not constitute plain error affecting substantial rights. (Ill. Rev. Stat. 1979, ch. 110A, par. 615(a); *Carlson*, 79 Ill. 2d 564, 576.) Evidence that an accomplice or codefendant was convicted of the same offense is admissible to impeach the accomplice although it is "generally inadmissible" to prove defendant's guilt at trial. (*People v. Sullivan* (1978), 72 Ill. 2d 36, 42, 377 N.E.2d 17.) The disclosure by the State on direct examination was designed to reduce the anticipated prejudicial effect the murder conviction would have on Rayna's credibility if the conviction was introduced by defendant on cross-examination. Neither the defense nor the State is required to wait for evidence damaging to credibility of a witness to be first established on cross-examination. See *People v. DeHoyos* (1976), 64 Ill. 2d 128, 131, 355 N.E.2d 19.

Defendant's reliance on *Sullivan*, 72 Ill. 2d 36, is misplaced. In that case the court reversed a conviction and remanded for a new trial. The State disclosed the accomplices' guilty pleas during its opening statement, one accomplice testified to his guilty plea, and the State relied heavily on the pleas in its closing argument. The State in *Sullivan*, "having failed to establish the defendant's guilt through the accomplices' testimony, urged the jury to gauge the defendant's guilt by reference to the fact that his alleged accomplices had already pleaded guilty to the same offense." 72 Ill. 2d 36, 43.

Those circumstances were not present here. Rayna's conviction was not mentioned in the State's opening statement. Not only did the State refrain from making an argument such as in *Sullivan*, but it also established defendant's guilt overwhelmingly. Aside from the various stories defendant told to extricate himself, Rayna made a full disclosure (see *People v. Campbell* (1979), 77 Ill. App. 3d 804, 815, 396 N.E.2d 607). Rayna testified defendant told him how he could make some money, but defendant could not do it because he knew the owner. Defendant told him what to do when he arrived and where the money was kept. Defendant showed Rayna the location of the laundromat and the route back to defendant's house.

In any event, any error which might have occurred would not have affected the jury's verdict and was therefore not prejudicial. (See *Sullivan*, 72 Ill. 2d 36, 44; *Campbell*, 77 Ill. App. 3d 804, 815-16.) We cannot say defendant was prevented from receiving a fair trial. See *Sullivan*, 72 Ill. 2d 36, 44.

## V

Defendant next complains he was improperly precluded from impeaching Rayna with proof of Rayna's prior misdemeanor theft conviction. Rayna was convicted of theft in April 1974 and received a 15-day

sentence. Rayna had taken his own hubcaps from a company which had towed his car.

The supreme court in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, adopted proposed Federal Rule of Evidence 609 which provided in part (Proposed Fed. R. Evid. 609(a)):

> "For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime, except on a plea of *nolo contendere*, is admissible but only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3), in either case, the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice."

Theft has recently been defined by the supreme court as "a crime involving dishonesty or false statement." (*People v. Malone* (1979), 78 Ill. 2d 34, 38, 397 N.E.2d 1377, citing *People v. Spates* (1979), 77 Ill. 2d 193, 202-03, 395 N.E.2d 563; *People v. White* (1980), 86 Ill. App. 3d 19, 23, 407 N.E.2d 572.) Therefore, Rayna's conviction of theft should have been admitted unless the danger of unfair prejudice outweighed its probative value. "[T]his determination involves the exercise of discretion on the part of the trial judge." *Malone*, 78 Ill. 2d 34, 38; *People v. Patterson* (1980), 88 Ill. App. 3d 168, 173, 410 N.E.2d 396.

■■ In our opinion, there was little danger of unfair prejudice which might result from the exclusion of this evidence. A conviction for theft based on taking his own hubcaps under the circumstances shown here has little or no significance when compared to Rayna's admission he tried to rob and then shot a man and his subsequent conviction. On a careful review of the record, we conclude defendant was not unduly prejudiced or deprived of a fair trial. (See *Patterson*, 88 Ill. App. 3d 168, 173.) We cannot say this ruling by the trial court was a breach of discretion. On the contrary, under the circumstances here shown, this theft conviction had no relation to Rayna's honesty or his ability to tell the truth. It was properly rejected particularly in view of the "wide latitude" given to the trial judge in this type of situation. See *Fleming*, 91 Ill. App. 3d 99, 108.

## VI

Defendant contends his sixth amendment right to counsel was violated when the trial court improperly permitted the State to cross-examine him as to his court-appointed counsel. The record reflects defendant testified on direct examination that at the time of the offense he was a switchman on the Milwaukee Railroad and had been working steadily. He stated he earned about $300 to $500 a week, and sometimes

$1000 a week, depending on the assignment. He also stated he earned from $16,000 to $30,000 a year. He testified, "I got paid just before this accident happened." He stated, therefore, he wanted nothing from any robbery.

On cross-examination defendant was asked "why if [he] had so much money [he] declared [himself] indigent and asked for a public defender and now a court-appointed attorney?" Defendant then stated he "misquoted [his] source of income" and had been "talking about * * * pay periods * * * [which] were every two weeks * * *." He said his previous estimate should be reduced by half. Defendant also testified he was paid "just before this incident happened." Defendant had money left over from his paycheck at that time.

It is proper on cross-examination to develop all circumstances which explain, qualify, discredit, or destroy the witness' direct testimony although such examination may incidentally be new matter. (*People v. Williams* (1977), 66 Ill. 2d 478, 486, 363 N.E.2d 801.) It is also proper for the State to elicit testimony on cross-examination which was "invited" by defendant. (*People v. Baker* (1980), 82 Ill. App. 3d 240, 244, 402 N.E.2d 662.) A "trial court is vested with 'substantial discretion' to determine both the manner and scope of cross-examination." (*People v. Coles* (1979), 74 Ill. 2d 393, 395-96, 385 N.E.2d 694, quoting *People v. McCain* (1963), 29 Ill. 2d 132, 134, 193 N.E.2d 784.) "Accordingly, the trial court's decision on such issues will not be overturned absent a showing of a 'clear abuse' of that discretion 'resulting in manifest prejudice.' " *Coles*, 74 Ill. 2d 393, 396, quoting *People v. Halteman* (1956), 10 Ill. 2d 74, 86, 139 N.E.2d 286.

■■ We find the record discloses proper impeachment by the State's Attorney. Defendant testified he had no reason to be involved in a robbery because he had a steady job and made between $16,000 and $30,000 a year. Defendant "invited" the assistant State's Attorney's inquiry as to whether defendant was in fact financially secure and had no reason to need profit from a robbery. The State's Attorney properly continued his impeachment by asking why defendant needed court-appointed counsel if he was so financially secure. Defendant then retracted his earlier statement and sought to reduce by half the previous estimate of his earnings. Defendant made several conflicting statements with regard to his resources. In our opinion, the State did not exceed the scope of proper cross-examination.

## VII

Defendant contends the trial court erred when it admitted defendant's prior conviction for armed robbery because it indicated a propensity to commit crime so that its prejudicial impact exceeded its probative value. Defendant also contends the State impermissibly emphasized his

conviction when it stated in closing argument defendant had been involved in an armed robbery before and Rayna had not.

Defendant was convicted of two armed robberies in December 1965. He was sentenced to 2 to 8 years in prison, served 3 years and 9 months, and was released in May 1969. Defendant's conviction for armed robbery was punishable by imprisonment in excess of 1 year, and less than 10 years had elapsed since his release from confinement.

Under *Montgomery*, 47 Ill. 2d 510, defendant's conviction was admissible unless its probative value was substantially outweighed by the danger of unfair prejudice. It is the province of the trial court to determine this issue. (See *Spates*, 77 Ill. 2d 193, 204-05.) In exercising its discretion, the trial court must consider the nature of the crime, its nearness or remoteness, its similarity to the crime charged, and the subsequent career of the defendant. (*Spates*, 77 Ill. 2d 193, 205; *Patterson*, 88 Ill. App. 3d 168, 173.) "The trial judge is given wide latitude" in this type of situation. *Fleming*, 91 Ill. App. 3d 99, 108.

■■ After a careful review of the record, we find defendant's prior conviction properly admissible to attack his credibility. The admission of the evidence did not show defendant must also have been guilty of the instant offense. "Obviously, robbery is a crime which, like stealing, relates directly to credibility." (*People v. Ridley* (1975), 25 Ill. App. 3d 596, 601, 323 N.E.2d 577, *appeal denied* (1975), 58 Ill. 2d 598.) As an additional safeguard, the trial court instructed the jury that evidence of defendant's previous conviction was to be considered "only insofar as it may affect his credibility as a witness, and must not be considered by you as evidence of his guilt of the crime with which he is charged." See Illinois Pattern Instructions, Criminal, No. 3.13 (1968) (hereinafter cited as IPI Criminal).

■■ In addition, we note defendant's failure to object to this comment by the State in closing arguments. Such failure to object ordinarily waives error. (*People v. Jackson* (1981), 84 Ill. 2d 350, 358, 418 N.E.2d 739.) However, we will add that we find this comment concerning defendant's prior conviction made during closing argument was a proper comment on the evidence. See *People v. Sanchez* (1981), 95 Ill. App. 3d 1006, 420 N.E.2d 680, and cases there cited.

## VIII

Defendant contends that testimony that Patricia Poliquin had not been charged for any offense should have been admitted. Defendant urges he was prevented from combating a negative inference that Patricia was absent because her testimony would harm defendant.

At the hearing on defendant's motion to suppress, Patricia refused to testify when called by the defense. She asserted her fifth amendment right against self-incrimination. The State moved *in limine* to prevent the

introduction of testimony at trial that Patricia was never charged. The trial court granted the motion. Defendant moved *in limine* to preclude the prosecution from commenting on her failure to testify. The trial court granted that motion also.

We find there was no need to bring the fact that Patricia was not charged before the jury. The "State's Attorney has always enjoyed a wide discretion *in both the initiation and the management of criminal litigation.*" (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 539, 397 N.E.2d 809, *cert. denied sub nom. Brown v. Illinois* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603; *People v. Ruiz* (1979), 78 Ill. App. 3d 326, 332, 396 N.E.2d 1314, *appeal denied* (1980), 81 Ill. 2d 597.) "That discretion includes the decision whether to initiate any prosecution at all, as well as to choose which of several charges shall be brought." (*Cousins*, 77 Ill. 2d 531, 539.) In the instant case, Patricia's guilt or innocence was not an issue. Whether Patricia was or was not charged was neither probative nor material on the issue of whether defendant was guilty or innocent of the crimes alleged.

■■ Furthermore, Patricia's right to take the fifth amendment was absolute. (*People ex rel. Bowman v. Woodward* (1976), 63 Ill. 2d 382, 385, 349 N.E.2d 57.) Both sides knew she would refuse to testify on fifth amendment grounds. In addition, the State was prevented from attempting to capitalize upon defendant's failure to call his wife by the favorable action of the trial court on defendant's motion *in limine*. We find no error here.

### IX

Defendant contends the State failed to prove defendant's guilt beyond a reasonable doubt. This argument is predicated solely on the theory that Rayna's testimony was given in return for leniency, was motivated by malice towards defendant, and conflicted with defendant's testimony.

We disagree. As shown above, evidence of defendant's guilt was overwhelming. The conflicting statements made by defendant himself constitute strong evidence of guilt. Rayna admitted his participation in the robbery and testified defendant was a coconspirator. Defendant told Rayna he should rob decedent, rather than a tavern or liquor store, what to do when he arrived at the laundromat, and how to get away. The evidence shows defendant even gave Rayna substitute bullets for his gun.

The uncorroborated testimony of an accomplice is sufficient to convict the accused. (*People v. Wilson* (1977), 66 Ill. 2d 346, 349, 362 N.E.2d 291.) This is true even though the accomplice testified he expected leniency. (*People v. Brisbon* (1980), 89 Ill. App. 3d 513, 526, 411 N.E.2d 956; *People v. Cowherd* (1980), 80 Ill. App. 3d 346, 349, 399

N.E.2d 672, *appeal denied* (1980), 81 Ill. 2d 585; *People v. Nickson* (1978), 58 Ill. App. 3d 470, 480, 374 N.E.2d 804, *appeal denied* (1978), 71 Ill. 2d 612.) But, as above shown, we have here an instance of testimony by an accomplice which is strongly corroborated.

■■ Furthermore, the jury was aware Rayna felt defendant had tricked him when he was arrested. All of the discrepancies between Rayna's and defendant's versions of the incident were fully presented to the jury. The weight of Rayna's testimony was fully explored by the evidence. One of the factual issues which was exclusively the province of the jury was the credibility of Rayna as a witness. We note also that the trial court properly instructed the jury concerning the need for suspicion and caution in considering the accomplice testimony of Rayna. (See IPI Criminal No. 3.17.) This court cannot substitute its judgment for that of the jury on questions involving the weight of the evidence and the credibility of all witnesses. (*People v. Sanders* (1980), 86 Ill. App. 3d 457, 475, 407 N.E.2d 951.) For these reasons the judgments appealed from are affirmed.

Judgments affirmed.

CAMPBELL, P. J., and McGLOON, J., concur.