THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GARY CAMPBELL, Defendant-Appellant.

Second District   No. 77-400

Opinion filed October 30, 1979.—Rehearing denied December 4, 1979.

Mary Robinson and Mark Heyrman, both of State Appellate Defender's Office, of Elgin, for appellant.

William J. Cowlin, State's Attorney, of Woodstock (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE WOODWARD delivered the opinion of the court:

Following a jury trial, defendant, Gary Campbell, was found guilty of murder, two counts of criminal damage to property over $150, reckless conduct, and criminal damage to property under $150. He was sentenced to concurrent prison terms of 14 to 21 years for murder, 1 to 3 years on each count of criminal damage to property over $150 and 364 days on each count of the reckless conduct and criminal damage to property under $150. Defendant appeals.

Louis Portalski testified for the State that he and David Klawes were employed by Boncosky Milk Transfer as truck drivers. During the early morning hours of October 20, 1976, Portalski and Klawes were each driving milk tankers in a northwesterly direction on Route 14. Portalski's truck was approximately 400 to 500 feet behind Klawes' truck as they both headed towards Wisconsin to pick up milk. As they approached

North Ridgefield road, Portalski noticed Klawes' truck begin to drift off the road; he then felt his own truck go over a large object, giving him a severe jolt. He then observed Klawes' truck drive off the road and strike a small shed. Portalski pulled his truck over onto the shoulder and ran over to Klawes' truck; he opened the cab door, saw that Klawes was severely injured and sought help. A few minutes later a sheriff's deputy arrived. Later that morning, while returning from Wisconsin, Portalski discovered that his axle and brake housing had been damaged. He did not see any vehicles pass by at the time Klawes drove off the road. On cross-examination, he admitted that he had not seen any foreign objects on the road or the shoulder near the scene of Klawes' death.

The State then introduced testimony of several witnesses who had suffered either property damage or physical injuries due to objects striking their cars as they drove along Route 14 on October 20, 1976. Arthur Engle testified that while driving northwest on Route 14 he observed a vehicle driving erratically towards him going southeast. As the vehicle passed he heard a "swish" and then something came through the window. Engle lost control of his car and then managed to stop on the right hand shoulder of the road. He realized he couldn't move his right hand and had difficulty breathing. A passing motorist drove him to the hospital. As he was helped out of the car he noticed a small rock lying on the floor board of his car. Engle was hospitalized for 30 days suffering from a collapsed lung, broken ribs and a damaged arm muscle. He could not identify the vehicle that passed him, but believed it was dark blue or black in color.

Edward Dzierozynski testified that as he was driving towards Ridgefield on Country Club Road his windshield was struck by a foreign object which shattered the glass but did not penetrate the vehicle. Dzierozynski testified that he did not know if the vehicle which passed him at the time of the incident was a van.

John Zachwieja was driving northwest on Route 14. As he passed a car going in the other direction he felt a jar from his left front wheel. His left front tire blew out and he stopped to change it. He later returned to this location and found an indentation in the road and a white rock off the side of the road in a gulley. He later gave the rock to police. Zachwieja also was unable to identify the vehicle which passed him.

Lawrence Feezel was driving southeast on Route 14. As he passed Lenzies' Restaurant he saw several small rock fragments and the one large rock lying in the roadway. He was unable to avoid the large rock and drove over it causing his right tire to blow out. He later discovered his wheel rim was bent.

Joseph Susong, an auto mechanic who repaired the Engle and Zachwieja vehicles testified that the total damage to Engle's car was

$546.73 and to Zachwieja's was $395.73. There was also testimony that it would cost in excess of $2000 to repair the damage to Klawes' truck.

Dr. Robert Stein, who at the time of the incident was the coroner's physician for McHenry County, performed an autopsy on Klawes. He testified that Klawes died as a result of severe cranial cerebral injury and partial decapitation, produced by a blunt object. Over defense objections, Dr. Stein used several full color photographs, set up on an easel, to demonstrate the partial decapitation.

The State also introduced testimony from a number of police officers, detectives and crime laboratory experts which established that the rocks which were found on Route 14, in Klawes' truck and in Engle's car, were stolen from the driveway of the Stonelake apartment complex. Rock chips from the recovered rocks were later found in the van allegedly used in the incident. The paint on the recovered rocks matched the paint which had originally been used on the rocks.

The State's occurrence witnesses were Daniel Craig, James Glasder and John and Joseph Shine, who originally were co-defendants on the same charges as the defendant here, and Kathy Coles and Ila Wright.

According to these witnesses, they were gathered in defendant's apartment in Algonquin, Illinois, drinking beer and smoking marijuana on the evening of October 19, 1976. The Shine brothers, Glasder and defendant agreed to accompany Craig in his van as he drove Coles and Wright home. Coles was dropped off first in Oakwood Hills near Crystal Lake, and Craig then drove northwest to Woodstock where Wright lived. During this drive Craig drove off the side of the road and hit a row of mailboxes located on the shoulder; he then backed up and hit them again. According to Joseph Shine and Ila Wright, someone threw an empty beer bottle out of the van; Wright thought at a sign while Shine stated that it was at a pickup truck; but neither knew who threw it. Craig thought that either Joesph Shine or defendant had thrown a beer bottle at a parked car.

According to Wright, as they approached the Stonelake Apartments where she lived, she heard defendant comment on the large white rocks which lined the driveway, and then someone else responded that they should pick up the rocks. However, none of the other witnesses remembered this exchange.

As Craig pulled the van out of the apartment complex, he stopped near the white rocks that lined the driveway, and the rest, including the defendant, began to load some of these rocks into the back of the van, intending to throw them at signs. Craig then drove north on Route 47 and then southeast on Route 14 towards Crystal Lake. During this drive, both Joseph and John Shine threw rocks at passing cars. After the rocks were

thrown, John Shine saw a car pull over and turn around. Fearing that the driver might pursue them, they left Route 14 near Ridgefield, turned onto a back road and stopped the van. Defendant and Joseph Shine got out of the van and defendant indicated that he was going to hitch-hike home; however, the others told him that no more rocks would be thrown and that they would head for home.

After getting lost, Craig got back on Route 14 and again headed southeast towards Crystal Lake. Defendant was seated in back of the front seats on the engine cover while Glasder and John Shine were seated near the back doors. Seeing two trucks coming northwest on Route 14, Glasder and John Shine opened the rear doors of the van and hung out the back with rocks in their hands. John Shine and Glasder then each threw one or more rocks at the second truck. John Shine heard a thud as both the first and second trucks passed, but he did not see anyone throw a rock at the first truck. When they saw sparks coming from underneath the wheels of the second truck, they turned off onto a side road and, with defendant's help, kicked the remaining rocks out the side door of the van into a ditch by the side of the road. Craig then drove the others home.

The State called as witnesses the attorneys who had represented the four co-defendants. Over defense objections, these witnesses were permitted to testify to the terms of the plea agreements which their clients had entered into; namely, that the co-defendants had pleaded guilty to involuntary manslaughter of David Klawes and to the attempted murder of Louis Portalski; that their clients had not agreed to testify for the State as part of the plea agreements.

Defendant testified on direct examination that during the drive to Woodstock to take Ila Wright home, he threw two bottles, one at a road sign and the second at an abandoned car which was sitting on the grass off the side of the road. Later, leaving the Stonelake Apartments, defendant helped load rocks into Craig's van after someone had suggested picking up the rocks and throwing them at "parked cars, signs, and mailboxes." As the van drove down Route 14, defendant threw a beer bottle which he had just emptied at a sign on the shoulder of the road. He then heard someone say, "Here comes a car." Defendant did not see any rocks thrown but saw a car in the distance put on its brake lights and swerve. The van pulled off the road because everyone was afraid the car would follow them. When defendant indicated he was going to hitch-hike home, he was told that no more rocks would be thrown.

The van then drove down Route 14 a second time. The defendant further testified as follows:

"Q Where were you seated at this time?

A I was sitting in the back, right at the base of the engine cover.

Q Where were the others seated?

A Joe Shine was in the passenger seat. Dan Craig was in the driver's seat; John and Jim were in the back end of the van, by the doors.

\* \* \*

Q What was the first thing that happened that you recall next?

A Well, I had asked somebody for a beer and then I opened it.

Q What were the others doing, do you know?

A I don't recall.

Q What happened next?

A Well, I remember somebody saying, 'Here comes two semis.'

Q Where did that come from; do you know?

A I believe it was Joe Shine.

Q And Joe was where at this time?

A At that time he was sitting in the passenger seat.

Q And what happened after that was said?

A Well, Joe Shine picked up two rocks off the engine cover and he proceeded out the passenger window.

Q And what did the others do, if anything?

A Well, the back doors had been opened and John was hanging out and Jim was kind of squatting down, facing the back end of the van.

Q Were they there when that comment was made about here comes the trucks?

A I don't recall.

Q What happened next?

A I remember somebody in the back saying, 'We are going to bomb them.'

Q What happened after that?

A Rocks were thrown and I noticed sparks coming off the second semi truck.

Q Where was the first semi?

A The first semi just kept going on down the road.

Q In what direction were you facing at that time?

A At that time I was facing the back end of the van.

Q After you saw the sparks, what happened next?

A John Shine came back into the van and I told him that he was crazy. He was going to get us all into trouble. I told him that I couldn't afford to get in any trouble. I didn't want to lose my job. Then the doors were closed. I told the guys then, 'If you guys ain't going to get rid of the rocks, I am going to get rid of them.' So, I took a couple of the rocks that were in my vicinity and I tossed them out the side door. I told Dan Craig to bring me home.

Q What were the others doing at this time?

A After a couple of minutes had gone by they opened up the back doors and I believe they started kicking some rocks out the back end."

Throughout his testimony defendant maintained that he himself had thrown no rocks at cars or trucks.

The jury returned verdicts finding defendant guilty of murder, involuntary manslaughter, reckless conduct, criminal damage (over $150) to the property of both Engle and Boncosky, and criminal damage (under $150) to the property of Boncosky. In his post-trial motion defendant argued that the jury verdicts finding defendant guilty of both murder and involuntary manslaughter of David Klawes were both legally and logically inconsistent. The trial court, in denying the post-trial motion and motion for a new trial, vacated the involuntary manslaughter conviction. This appeal followed.

The first issue on appeal is whether the State proved defendant guilty of murder beyond a reasonable doubt. Defendant contends first that the evidence failed to prove that the acts which caused Klawes' death were performed with the requisite mental state, and secondly, that the State failed to prove beyond a reasonable doubt that he was legally accountable for Klawes' death. Section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 9—1) provides:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

* * *

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another;

* * * ."

While there was no evidence defendant himself threw any rocks out of the van, defendant does not challenge the State's evidence that someone in Craig's van threw a rock that caused Klawes' death. Defendant suggests, rather, that the evidence fails to prove that the acts which caused Klawes' death were performed with the mental state required for murder, as quoted above.

The testimony at trial revealed that only James Glasder and the Shine brothers threw rocks from the van. According to Glasder, when someone yelled out that the trucks were coming, Glasder picked up a basketball-sized rock and tossed it out the back of the van, along with one or two of the other rocks. He was "hoping that the truck would roll over it, make a big thud, scare the hell out of the driver." Likewise, John Shine admitted throwing a rock when the two semi trucks approached; as they passed, he "shot-puted" a rock weighing approximately 20 pounds; he heard a thud and thought the rock hit the second truck. However, he stated

he never intended to hit any windshields or to hurt anyone; he just intended to hit the side of the truck. Joseph Shine testified that he threw two rocks out of the front passenger window of the cab during the first trip down Route 14, but that he was trying to hit a sign. He stated that he did not intend to throw rocks at cars when he helped load the rocks into the van, and he denied throwing any rocks during the second trip down Route 14, the trip during which Klawes was killed; nor did any of the witnesses see Joseph Shine throw any rocks on the second trip.

Each of the witnesses (rock throwers) denied any intent to hurt anyone. Defendant submits that this testimony (by the State's witnesses) together with the other evidence at trial shows that the actions of Glasder and the Shine brothers in throwing the rocks from the van were reckless and constituted involuntary manslaughter. A person commits involuntary manslaughter when he

> " * * * unintentionally kills an individual without lawful justification * * * if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, * * * ." (Ill. Rev. Stat. 1975, ch. 38, par. 9—3(a).)

Having reviewed the record in this case, particularly the testimony of the co-defendants, we are not convinced beyond a reasonable doubt that the co-defendants knew their acts created a strong probability of death or great bodily harm as required for a murder conviction, and agree with defendant that their acts constituted involuntary manslaughter. This conclusion is further borne out by the fact that the jury found the defendant guilty of involuntary manslaughter as well as guilty of murder.

Having concluded that the co-defendants committed the acts which resulted in Klawes' death while possessed of the requisite intent for involuntary manslaughter, we must next determine whether the State proved beyond a reasonable doubt that defendant was legally accountable for those acts. Since there was no evidence that defendant engaged in the rock throwing, it was necessary for the State to prove that defendant was accountable for the acts of some other person which resulted in Klawes' death.

■■ In order to prove legal accountability for the acts of another, the State must prove beyond a reasonable doubt, three propositions: (1) that a defendant solicited, aided, abetted, agreed or attempted to aid another person in planning or commission of the offenses; (2) that this participation must have taken place either before or during the commission of the offenses; and (3) that it must have been with the concurrent specific intent to promote or facilitate the commission of the offenses. (*People v. Tillman* (1971), 130 Ill. App. 2d 743, 749, 265 N.E.2d 904,

909.) Defendant contends that under the evidence at trial none of these propositions have been established.

■■ We disagree. Mere presence may be considered with other facts and circumstances in determining whether a defendant is accountable for the criminal act of another. (*People v. Gray* (1977), 47 Ill. App. 3d 1026, 365 N.E.2d 501.) Further, where one attaches himself to a group bent on illegal acts which are dangerous or homicidal in character or which will probably or necessarily require the use of force and violence that could result in the taking of life unlawfully, he becomes criminally liable for any wrongdoing committed by the other members of the group in furtherance of the common purpose, or as a natural or probable consequence thereof, even though he did not actively participate in the overt act itself. See *People v. Hughes* (1962), 26 Ill. 2d. 114, 119—20, 185 N.E.2d 834, 837.

There was evidence that prior to picking up the rocks at the Stonelake Apartments, defendant threw beer bottles out of the van, one of which he threw at an abandoned car. Once at the apartment complex someone suggested, "Let's pick up rocks and throw at parked cars, signs and mail boxes." Defendant, while expressing concern over the stealing of the rocks, nevertheless helped to load the rocks into Craig's van. Defendant was present in the van during the first trip down Route 14 during which rocks were thrown; however, there was no evidence that defendant attempted to prevent the throwing of the rocks. When a car stopped and looked as though it might follow the van, defendant stated that they would all get in trouble for this activity. Craig then pulled the van off the road to avoid being detected. Defendant then stated that he would hitchhike home, but he stayed when the others stated that no more rocks would be thrown. He did not insist that the rocks be removed from the van. Further, he knew that his friends (the co-defendants) had been drinking beer and smoking marijuana and that their statements and assurances were of little value. However, when, on the second trip down Route 14 the former conduct continued and the rock throwing began again, defendant made no attempt to stop these activities, nor did he request Craig to let him out of the van. Finally, defendant helped remove the remaining rocks from the van after rocks were thrown at the two semi trucks. While defendant suggests that this action was to prevent more rocks from being thrown, it also indicated defendant's attempts with the others to cover up the traces of the offense, especially in light of the fact that defendant did not insist on the removal of the rocks after he was told no more rocks would be thrown.

■■ We conclude, therefore, that the evidence was more than sufficient to prove defendant legally accountable for the acts of the co-defendants which resulted in the death of David Klawes. On the basis of the

foregoing discussion, we therefore vacate defendant's conviction and sentence for murder and remand with directions to the trial court to reinstate defendant's involuntary manslaughter conviction and to sentence defendant accordingly.

Defendant also contends that the State failed to prove that defendant was legally accountable for the acts which resulted in the property damage counts and reckless conduct count which the jury found against defendant. However, on the basis of the testimony described above and our discussion of legal accountability in this opinion, we conclude that there was sufficient evidence to support a finding that the defendant was legally accountable on those counts as well.

We will now proceed to discuss the various errors raised by defendant which he alleges deprived him of a fair trial.

Defendant contends he was denied a fair trial when the trial court permitted the State to impeach its own witnesses. Prior to trial the State sought to have Dan Craig and John Shine called as court's witnesses, alleging that these co-defendants would lie to protect the defendant and therefore the State could not vouch for their veracity. After hearing the testimony of Joseph Shine and James Glasder, the trial court denied the State's motion. Defendant maintains, however, that despite the trial court's ruling the State repeatedly attempted to impeach not only Craig and John Shine but the other two co-defendants as well.

Each co-defendant testified as to pleading guilty to charges of involuntary manslaughter and attempted murder brought against them in connection with this occurrence. The State also called the attorneys who had represented each of the co-defendants and questioned them as to the terms of the plea agreements, including the fact that the co-defendants had not agreed to testify as part of those agreements. The defendant objected to the calling of the attorneys to testify; however, the State argued that that testimony was necessary as it wasn't clear what charges the co-defendants had pleaded to and to show that there was no agreement as to the co-defendants' testimony in exchange for the guilty plea. The trial court overruled the objection and permitted the witnesses to testify as to whom they represented, the charges that their clients had pleaded guilty to and what the terms of the negotiations were as related to any agreement to testify. Defendant contends that the admission of this testimony was error in that the State was thus allowed to both emphasize these charges and to further associate the defendant with individuals who had already confessed guilt to charges involving the defendant. It also further impeached the co-defendants' credibility due to the emphasis on their convictions resulting from their pleas of guilty.

Defendant also cites various instances during the direct examination of the co-defendants in which the State asked questions tending to

impugn their testimony. However, the defendant's objections to those questions were sustained by the trial court. Finally, defendant contends that in closing argument, the State continued to attempt to instill in the minds of the jury that these witnesses could not be trusted. However, defendant failed to object to these remarks.

It is a general rule that a party who calls a witness to testify can not directly impeach his testimony. (*People v. Wesley* (1959), 18 Ill. 2d 138, 163 N.E.2d 500.) However, if a party finds it necessary to question the veracity of his own witness, procedures exist for doing so. Supreme Court Rule 238 (Ill. Rev. Stat. 1977, ch. 110A, par. 238) provides:

> "If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination. * * * "

The extent to which such cross-examination shall be permitted rests largely in the discretion of the trial judge who can best pass upon the question from the manner of the witness, his attitude and appearance. *People v. Wesley* (1959), 18 Ill. 2d 138, 151, 163 N.E.2d 500, 507.) Further, the party wishing to have the witness called as a court's witness must make a showing that manifest injustice would result if the request were denied. *People v. Kelly* (1976), 39 Ill App. 3d 190, 350 N.E.2d 163.

■■ The State argues that the trial court abused its discretion in denying its motion to call the two co-defendants as court's witnesses. However, examination of the testimony of these co-defendants does not reveal an effort on their parts to protect defendant, nor was the State surprised by any of their testimony at trial. No manifest injustice occurred as a result of the trial court's refusal to grant the motion and therefore we hold that no abuse of discretion occurred.

■■ However, we would agree with the State that any error which occurred as a result of the attempts by the State to impeach its own witnesses was harmless beyond a reasonable doubt. In some instances cited, the evidence was properly before the jury, in others the trial court sustained defendant's objections; and finally in some instances no objection at all was made. We are of the opinion that the case before us is distinguishable from *People v. Sullivan* (1978), 72 Ill. 2d 36, 377 N.E.2d 17. In *Sullivan*, our supreme court determined that the defendant there was deprived of a fair and impartial trial due to the prosecutor's disclosure of the alleged accomplices' guilty pleas during opening statement and upon direct examination of one of the alleged accomplices and his reliance on such during closing argument in urging the jury to find defendant guilty, despite the defense counsel's failure to object to the argument or request that a cautionary instruction be given. In the case before us, the co-defendants made full disclosures, while in *Sullivan* the alleged accomplices never testified as to the details of their own or

Sullivan's participation in the alleged offense (robbery). (See *People v. Baker* (1959), 16 Ill. 2d 364, 158 N.E.2d 1.) Nor does the prosecutor's argument here contain the same emphasis on what the co-defendants pleaded guilty to, so as to permit the jury to find defendant guilty merely on the basis of their prior guilty pleas. While we do not condone the use of the guilty pleas for any purpose other than to show the absence of an agreement for the co-defendants' testimony, nevertheless, we conclude any error which may have occurred would not have affected the jury's verdict, and therefore was not prejudicial in this case.

Next, defendant contends he was denied a fair trial due to the admission at trial of certain photographs. At trial, over defense objections, the State introduced into evidence six 8″ x 10″ color photographs of David Klawes as he appeared in the interior of the truck cab at the scene of the incident and later on the autopsy table. Defendant filed a motion in limine seeking to prevent the State from introducing 11 such photographs into evidence, arguing their prejudicial nature and offering to stipulate to the cause of Klawes' death and to any other material and relevant purpose for which they might be admitted. The State argued that the photographs indicated that the acts of rock throwing yielded a strong probability of death or great bodily harm. The trial court held that the photographs were probative of issues that the State was required to prove in this case and denied the motion in limine.

At trial, Dr. Stein, who performed the autopsy on Klawes, used two of the photographs to illustrate his testimony describing Klawes' injuries. These two photographs were admitted into evidence. Near the end of the State's case the State sought to introduce the remaining photographs. Following a discussion, the State agreed to withdraw two of the photographs. The trial court refused to admit four others but did admit the remaining four. These six photographs were then taken into the jury room over defense objection.

Rather than a graphic description of each photograph, suffice it to say that the photographs clearly depicted the partial decapitation of Klawes as he lay in the truck cab; on the autopsy table; as well as the bloody brain-splattered interior of the truck cab. This court would agree with the trial court that these photographs were both "gruesome and horrible."

■■ Defendant argues that these photographs were irrelevant, unnecessary and prejudicial in light of the fact that the sole issue here was the knowledge and intent of the occupants of the van when the rocks were thrown at the semi trucks, and that defendant offered to stipulate as to the cause of death. It has been established through a long line of cases in this State that the admission into evidence of a photograph of a murder victim is within the discretion of the trial court, and when the photograph is relevant to establish some material fact it is admissible despite its

gruesome nature. (*People v. Garlick* (1977), 46 Ill. App. 3d 216, 360 N.E.2d 1121.) The fact and cause of death, the number and location of the wounds, the manner in which they were inflicted and the willfulness of the act in question are all material to the offense charged. (*People v. Jenko* (1951), 410 Ill. 478, 482, 102 N.E.2d 783, 785.) Further, the State has a right to prove each and every element of the crime, even though the defendant stipulates to the identity of the deceased and the cause of death. *People v. Kuntz* (1977), 52 Ill. App. 3d 804, 368 N.E.2d 114.

In *People v. Garlick*, relied on by the defendant, the reviewing court specifically held that the admission of a color photograph of a decedent's massive head wound could serve no purpose other than to inflame and prejudice the jury in the grossest manner, and in view of the defendant's admission of the offense and his defense of insanity, the photograph was not probative of any material issue in the case. There was no question that the wound was caused by a shotgun, especially in view of defendant's admission, and therefore the court found no reason to graphically illustrate the medical testimony which by itself was wholly understandable. In the case before us however, the photographs helped to illustrate Dr. Stein's testimony as to how the rocks thrown at the moving truck could have inflicted the injuries that resulted in Klawes' death.

Further, unlike *Garlick*, defendant here has steadfastly maintained his innocence of the charges of murder and involuntary manslaughter. ■■ The photographs here were an aid to the jury in determining whether the acts which caused such injuries were performed with the knowledge that such activity had strong probability of causing death or great bodily harm. Finally, the mere fact that the photographs were in color does not prevent their admission into evidence. (See *People v. Rowland* (1978), 61 Ill. App. 3d 311, 378 N.E.2d 326.) We therefore conclude that the photographs were properly admitted into evidence.

■■ ■ Finally, defendant contends he was denied a fair trial due to a disturbance in the courtroom caused by Klawes' four-year-old son. Prior to trial, defendant moved to exclude the child from the courtroom during the trial, arguing that the jury would be prejudiced by seeing Klawes' son seated next to his mother who would be a witness in the case. On the motion, Mrs. Klawes testified that she could not afford a babysitter while she was in court and would remove her son during any inappropriate testimony. There had been a prior incident in which she had been talking to her son while court was in session, but she testified that she would keep the child quiet in the future. The trial court then denied the defendant's motion. During the cross-examination of defendant, the child cried out, "Mommy, I want you." Defense counsel moved for a mistrial. The trial court denied the motion; however, at defense counsel's request, the trial

court ordered the record to reflect what had prompted the defense's motion.

Defendant contends that the error in denying the prior motion to exclude led to the incident during defendant's testimony described above and that the trial court compounded its previous error by denying defendant's motion for mistrial. Defendant relies on *United States v. Davis* (7th Cir. 1976), 532 F. 2d 22, where during the government's cross-examination of the defendant, a government witness repeatedly leaned back in his chair and laughed. The court of appeals found that this conduct, when coupled with other prejudicial conduct by the government, warranted a reversal of defendant's conviction. In *People v. Dixon* (1976), 36 Ill. App. 3d 247, 253, 343 N.E.2d 583, 587, the court stated:

> "A trial judge has wide discretion in maintaining order in the courtroom and it is his duty to do so. [Citation.] Spectators at any trial should not be permitted to manifest their prejudice or partisanship. If this occurs, the court must take the necessary steps to preserve order and decorum. [Citation.]"

While perhaps unfortunate, the act of a child who has not appeared as a witness, merely calling for his mother, is hardly comparable to the situation in which a government witness comments in his own way on a defendant's testimony. We are of the opinion that the trial court did not abuse its discretion in denying the motion to exclude the child in light of his mother's assurances that she would keep the child quiet. Further, after reviewing the record of the incident we fail to see how defendant was prejudiced, and therefore no abuse of discretion occurred in the denial of the motion for a mistrial.

Therefore, we vacate defendant's conviction and sentence for murder and remand with directions to the trial court to reinstate defendant's involuntary manslaughter conviction and to sentence defendant accordingly. The remainder of the judgment of the circuit court of McHenry County is affirmed.

*Affirmed in part, reversed in part and remanded with directions.*

RECHENMACHER and LINDBERG, JJ., concur.