THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID S. MELIND, Defendant-Appellant.

Second District    No. 2—87—0531

Opinion filed February 23, 1989.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant appeals his murder conviction for which he was sentenced to 32 years.

On appeal, defendant contends that (1) he was not proved guilty of murder beyond a reasonable doubt; (2) he was denied his right to pretrial disclosure of exculpatory evidence; and (3) his sentence is excessive. We affirm.

On November 10, 1986, John Kugelman, an Illinois State trooper, died after being struck by an automobile driven by defendant, David Melind. An indictment was filed on November 19, 1986, charging defendant with three counts of murder and one count of reckless homi-

cide. Two of the murder counts were nol-prossed by the State prior to the start of trial on April 22, 1987. The remaining count of murder charged defendant with violation of section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2)), that defendant knew his conduct created a strong probability of death or great bodily harm to John Kugelman.

Prior to trial, defendant requested discovery of Officer Kugelman's personnel file. The trial court denied this request.

At trial, Wesley Schulz, a Hoffman Estates police officer, testified that he was on duty on the afternoon of November 10, 1986. At 3:30, he noticed a car passing him in the opposite direction travelling at a high rate of speed. Schulz checked his radar and determined that the car was travelling at 40 miles per hour, 20 miles per hour over the speed limit. Schulz then turned his car around, activated his emergency lights, and went after the car. In addition to the driver, the car which Schulz was pursuing had a passenger in the front and one in the back. As Schulz followed, the car turned around a corner and accelerated, going 55 miles per hour through the parking lot of Conant High School. The car then slowed and turned southbound onto Plum Grove Road, going through a stop sign. Schulz stated that he saw the car's brake lights as the car slowed around the corners. Schulz called in a report that he was chasing after a car. Schulz testified that at one point the car was going 60 miles per hour down a two-lane road. The car then ran through a red light at Schaumburg Road, going across the intersection on the wrong side of the road. An Illinois State police car turned on its warning lights and joined the pursuit. The speeding car proceeded through a number of residential streets, going through stop signs, weaving around traffic, and hitting speeds of 50 to 60 miles per hour.

When the car got onto Route 72 (Higgins Road), it was going 70 miles per hour. Schulz noticed that another Hoffman Estates squad car and a Schaumburg unit had also joined the chase. Driving on the shoulder of the road and going through another red light, the car proceeded onto an on-ramp and headed southbound on Route 53 (Illinois Highway 290). Schulz and the other police cars followed, at 80 miles per hour.

Schulz described the traffic volume on Route 53 as being light to medium. Schulz stated that the car continued to weave around traffic. Whenever Schulz would get close to pulling along side the car, the car would swerve and block Schulz' progress. The car also drove on both the right and left shoulders of the highway a number of times.

After about 4½ miles, Schulz noticed that the traffic ahead, near the overpasses for the Milwaukee Road train tracks and Irving Park

Road, had slowed to a stop in all three lanes. The car pulled out onto the left shoulder of the road, and Schulz and the other police cars followed. As Schulz straddled onto the shoulder, he saw a uniformed State trooper step out onto the left shoulder. According to Schulz, the trooper had his hand in the air "as if to signal the car to stop." Schulz stated that the car kept going straight without slowing down. Schulz did not see the car swerve or its brake lights go on. Schulz next saw the windshield of the car shatter, and the trooper was propelled into the air. Schulz stated that the trooper landed some 200 feet down the road in the center of the southbound lanes.

After the impact and after going one-tenth of a mile further, the car swerved to the right side of the highway, crossing all lanes and entering onto a ramp leading to eastbound I-290, still going at 80 miles per hour. About three miles later, with the help of other squad cars, Schulz was able to force the car to a stop on the right shoulder. Defendant was arrested by another police officer and taken to the Hoffman Estates police department.

At the police station, Schulz gave *Miranda* warnings to defendant, who agreed to talk. Schulz asked defendant why he did not stop, to which defendant replied: "I didn't know that guy was going to jump out in front of me." Asked if he tried to avoid hitting the trooper, defendant told Schulz: "Well, at the last, I did. I thought he was going to get out of the way." When defendant refused to make a written statement, Schulz ended his interrogation.

On cross-examination, Schulz stated that he had his squad car three to four lengths behind defendant's car at the time of the impact and was looking through the windshield of defendant's car. Schulz said he saw the trooper step two or three feet onto the shoulder and that the collision happened "quick."

Schulz recalled seeing the trooper's car blocking the left and center lanes of traffic. The trooper's car had no light bar on its roof. Cars backed up in the left lane prohibited any movement to the right. To the left of the shoulder, at a slight slope, was a grassy area. In the middle of the median strip, there was a concrete pillar for the overpass. Schulz said it would have been possible to drive around the trooper yet avoid the pillar.

Samuel Tolub testified that he was driving in the left lane of Route 53 when he saw a trooper drive across the median and block his progress. Tolub stopped his car by the Irving Park Road overpass. His was the closest car to the trooper's unit. Tolub testified that the trooper's car had lights in the back window but that there was no light bar on the roof. What Tolub thought was a few seconds later, the trooper

got out of his car, walked over to the shoulder of the road in front of the overpass, pulled out his pistol, went into a crouched position, and pointed his gun in a northbound direction. Tolub then heard the sound of gravel flying and police sirens from behind. When he turned his head to see what was happening, the trooper was hit. Tolub testified that the trooper was on the shoulder 10 to 15 seconds before being hit. He later said that this was a "guestimate." Tolub recalled that the road was dry and the visibility was good.

James Chanell testified that he was stopped in the left lane, at a distance he estimated to be 10 to 15 car lengths, or 400 to 500 feet, away from where the trooper stood on the shoulder. Chanell testified that as he was travelling southbound on Route 53, a squad car pulled out and blocked the left and middle lanes. He then saw the officer on the shoulder with his legs spread, knees bent, and a gun pointed in Chanell's direction. He stated that a "second or so later" a car passed him down the shoulder. Then, in about a "four-to-five-second snap," Chanell saw the policeman flying through the air.

Dennis Ehrhardt testified that he stopped about 15 car lengths or 180 feet from the trooper. Ehrhardt saw the trooper take one step onto the shoulder and assume a firing stance. Ehrhardt stated defendant's car did not swerve in any direction, its brake lights did not come on, and he did not detect any slowing down. According to Ehrhardt, the trooper was on the shoulder for between 7 to 10 seconds before being struck.

Edward Donoghue, a forensic pathologist, testified that he performed the autopsy on Kugelman. Donoghue noted impact bruises on the rear of Kugelman's thighs at a height consistent with the front of an automobile. No impact injuries were detected on the front of the body.

Du Page County Assistant State's Attorney Joseph Birkett testified that he questioned defendant on the night of November 10, 1986. According to Birkett, defendant recalled hitting speeds of 70 to 80 miles per hour before getting on Route 53. Defendant also recalled going 80 miles per hour on Route 53. According to Birkett, defendant stated that he was driving on the shoulder for about two miles before seeing the trooper, who "just jumped out in front of him." Defendant saw the gun pointed at him and kept going. Defendant "recalled trying to touch the brakes but didn't swerve." According to Birkett, defendant said that he had seen the trooper's car angled in the roadway blocking traffic. Defendant stated that he was afraid that the trooper would shoot him and that he did not try to go around the trooper because he was afraid he might hit the viaduct. According to Birkett's

report, "David explained to me that he was going so fast he could not stop. He said it was too late to stop, so, he just kept going."

At 1:30 a.m., Birkett again talked to defendant, and, according to Birkett, defendant said he could see the trooper for 5 to 10 seconds before he hit him.

Erick Norwood, an accident reconstruction expert for the Illinois State police, testified concerning measurements he had taken subsequent to the accident. Norwood stated that the individual traffic lanes on Route 53 average 12 feet in width and that the left shoulder was 10 feet 8 inches wide. The median is made of gravel and dirt. The distance between the edge of the shoulder to the concrete abutment at the Irving Park Road overpass is approximately 23 to 24 feet. The median at the spot is pitched at a 3% grade, meaning it drops one foot in height for every eight feet in distance. Norwood described the highway as straight, flat, and without road hazards.

Norwood further testified that an inspection of defendant's car revealed that the car's tires were normal and the brake lights were functional, as was the steering and suspension. Norwood drove the car in a police parking lot and found it had the ability to stop. Norwood stated that at 80 miles per hour, a car travels 117 feet per second. At 85 miles per hour, the car travels 124.81 feet per second. Norwood stated that a person's average reaction time would be three-quarters of a second to one second.

Scott Paul, who was a passenger in the car, testified that defendant was driving in excess of 80 miles per hour on Route 53. According to Paul, they were about 100 feet, or five or six car lengths, away when the trooper stepped out in front of their path. Paul did not see the trooper turn or move out of the way. Paul stated that it felt as if their car "slagged for a second" prior to impact, as if defendant pushed on the brakes. Paul felt a downward movement. Paul stated that defendant never talked during the chase and appeared to have no trouble operating the car. At some later date, defendant told Paul he had seen the trooper before the collision.

Defendant testified that he received his driver's license in August 1985 and had been driving for about 10 months prior to November 1986. Defendant recalled driving as fast as 86 or 87 miles per hour on Route 53. According to defendant a lot of his attention was focused on the police in his rearview mirror. The car behind him was one-half to one car length behind in traffic and all three lanes were stopped and bumper to bumper. According to defendant, he did not see any squad car by the Irving Park Road overpass. He was driving at 80 miles per hour when the trooper ran out onto the middle of the shoulder and

pointed his gun, some 50 to 75 feet away. Defendant did not expect that anyone would step onto the shoulder and stated "there wasn't anything I could do." Defendant further stated that he was pretty sure that he let up on the gas pedal but did not have an opportunity to apply the brakes.

Defendant testified that he did not intend to strike the trooper and did not want to hurt him. Defendant also said that he did not think this act would happen when he ran away from the police. Defendant denied having enough time to swerve left or right to avoid hitting the trooper. Defendant closed his eyes at the moment of impact and did not know whether the officer had turned to get away. He denied telling Paul that the trooper was on the shoulder for 5 to 10 seconds.

On rebuttal, Birkett testified that defendant had stated that he saw the police officer for 5 to 10 seconds before he hit him.

Donald Marek testified that he was driving on the right-hand side of the highway when the trooper stopped the traffic. Marek pulled onto the right shoulder to avoid hitting a van which had stopped in front of him and ended up beyond the roadblock, ahead of the rest of the traffic. Marek kept driving forward, at about five miles per hour, during the time in question. According to Marek the trooper was standing on the left shoulder 8 to 10 seconds before being hit. On cross-examination, Marek admitted being some 700 to 800 feet away from the trooper at the time of the collision and having watched the incident by means of his side-view mirror.

David Kodat testified that he had stopped some 150 to 200 feet south of the Irving Park Road overpass in the right-hand lane. He saw the trooper get out of his squad car, go to the rear bumper of the car, look north while in the left-hand lane and then step onto the shoulder. The trooper stood on the shoulder for three to four seconds then assumed a planted position with his gun and was struck three to four seconds later. Kodat did not see the car strike the trooper and never saw the car itself.

The jury returned verdicts finding defendant guilty of the offense of murder and aggravated fleeing or attempting to elude a police officer. No verdict was returned on the reckless homicide charge.

The court imposed a 32-year term of imprisonment on the murder charge and a concurrent 360-day jail term on the aggravated fleeing conviction.

■ Defendant's initial contention is that the facts did not prove him guilty of murder but rather reckless homicide. Defendant was charged with murder under section 9—1(a)(2), which is defined as follows:

"A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

\*\*\*

(2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another \*\*\*." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2).)

In contrast, reckless homicide is defined as follows:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, except in cases in which the cause of the death consists of the driving of a motor vehicle, in which case the person commits reckless homicide." (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a).)

Whether particular acts create a "strong probability" of death or great bodily harm as used in section 9—1(a)(2) is a question of fact. (*People v. Johnson* (1975), 33 Ill. App. 3d 168, 174.) The committee comment on section 9—1(a)(2) recognizes that the difference between murder under section 9—1(a)(2) and reckless homicide is not easily discernible. The comment states:

"Clearly, no sharp dividing lines can be drawn, but the Committee chose 'strong probability' as the plainest description of the situation which lies between the 'practical certainty' of the preceding subsection, and the 'likely cause' and 'substantial and unjustifiable risk' of the involuntary manslaughter provision \*\*\*." Ill. Ann. Stat., ch. 38, par. 9—1(a)(2), Committee Comments, at 18 (Smith-Hurd 1979).

In the instant case, various witnesses testified as to the amount of time that Kugelman was on the shoulder prior to the collision. Tolub stated that the officer was there 10 to 15 seconds; Ehrhardt, 7 to 10 seconds; Paul, 2 seconds; Merek, 8 to 10 seconds; and finally, Birkett testified that defendant stated that he had seen the officer 5 to 10 seconds before the collision. Given these statements, we find that there was evidence sufficient for the jury to conclude that defendant saw Kugelman at least 10 seconds prior to the collision. The evidence also showed that defendant did not hit his brakes, did not slow down, and did not swerve to avoid Officer Kugelman. Under the above facts, we find that the evidence supports the finding of guilty of murder because, by defendant continuing along at 80 miles per hour, the jury could have reasonably concluded that defendant would have

known that there was a strong probability of causing death or great bodily harm to Officer Kugelman.

Defendant has argued that the instant case is analogous to this court's decision in *People v. Campbell* (1979), 77 Ill. App. 3d 804. In *Campbell*, the defendant had been riding in a van with several other individuals who threw rocks out of the van in the direction of other vehicles. (77 Ill. App. 3d at 808.) One of these rocks hit a truck driver and resulted in his death. (77 Ill. App. 3d at 808.) The defendant in that case was subsequently found guilty of murder on an accountability theory. (77 Ill. App. 3d at 811.) The individuals who had actually thrown the rocks testified at trial and, in so doing, denied any intent to hurt anyone. (77 Ill. App. 3d at 812.) This court in reversing the murder conviction stated that having reviewed the record "particularly the testimony of the co-defendants, we are not convinced beyond a reasonable doubt that the co-defendants knew their acts created a strong probability of death or great bodily harm." 77 Ill. App. 3d at 812.

The instant case is distinguishable from *Campbell* because there the State's witnesses were the individuals who actually threw the rocks, it was their mental state which was controlling, and this court found that they did not have the requisite mental state for murder. In the instant case, it is defendant's mental state that is controlling and which must be inferred from his actions. (See *People v. Koshiol* (1970), 45 Ill. 2d 573, 578.) And, as stated above, evidence supports the jury's conclusion that defendant had the requisite mental state for murder under section 9—1(a)(2) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(2)).

■ Defendant next contends that the trial court erred when it refused to conduct an *in camera* review of Kugelman's personnel file. Defendant argues that the personnel files might offer an explanation of why Officer Kugelman took actions which were inconsistent with standard police procedures. Defendant does not, however, explain how this information might be relevant. Rather, defendant appears to assert that this case is similar to other cases in which relevancy has been found. Defendant cites *People v. Gossett* (1983), 115 Ill. App. 3d 655, 662-65, *People v. Lynch* (1984), 104 Ill. 2d 194, *People v. Gacy* (1984), 103 Ill. 2d 1, and *People v. Gorney* (1985), 107 Ill. 2d 53.

None of the above cases are similar to the instant case. In the above cases, testimony as to character of the victims was found to be relevant to either establish a defense (*Gorney*, 107 Ill. 2d at 61; *Lynch*, 104 Ill. 2d at 199-200; *Gossett*, 115 Ill. App. 3d at 662-65) or to discredit the defendant's argument (*Gacy*, 103 Ill. 2d at 85). In the instant case, it appears that defendant wishes to explain why Officer Kugelman stepped out in front of defendant's car. However, defendant

does not suggest why this information is relevant. We therefore find that the trial court did not err in denying defendant's motion without conducting an *in camera* inspection of Officer Kugelman's personnel file.

█ Defendant's final contention is that his sentence is excessive. Defendant argues that his actions were more akin to reckless homicide than murder and that his conduct was not intentional. Defendant therefore requests that this court reduce his sentence to the minimum of 20 years' imprisonment.

Contrary to any argument of defendant, it is clear that defendant was found guilty of murder and therefore his actions were not more akin to reckless homicide than murder. Defendant's contention must be taken to mean that it is the least serious type of action that can result in murder. This might be true. Nevertheless, we find that the trial court's imposition of 32 years' imprisonment was not an abuse of discretion.

The presentence report indicates that defendant had a history of juvenile delinquency, including residential burglary, theft under $300 (three counts), and theft (auto). The report further reveals that while defendant was on parole for the last theft he was apprehended for theft, battery, and possession of alcohol. He was thereafter found to be in violation of his parole and transferred to Illinois Youth Center, Valley View. At the time of the instant offense, defendant had run away from an extended authorized absence from Valley View, and, according to defendant, this is why he attempted to flee from the police in the first place.

The trial court took into account the above record along with the fact that defendant endangered the lives of many other people and did not stop until several miles after the collision. These aggravating factors were properly considered by the trial court. (See Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.2(a)(1), (a)(3), (a)(10).) Accordingly, we find that the trial court did not abuse its discretion in imposing a sentence of 32 years' imprisonment.

For the forgoing reasons, we affirm the judgment of the trial court.

Affirmed.

UNVERZAGT, P.J., and DUNN, J., concur.